IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY S. BRUCE, | ) | CASE NO. 1:20CV505 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jeffrey S. Bruce ("Bruce") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying his application for
Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.
§ 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and
Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's
decision be **AFFIRMED**.

## I. Procedural History

Bruce filed an application for DIB in May 2016, alleging a disability onset date of August
1, 2015.  Tr. 15, 187.  He alleged disability based on the following: osteoarthritis of both knees
and hands, bulging disc in lumbar spine, and high blood pressure.  Tr. 238.  After denials by the
state agency initially (Tr. 83) and on reconsideration (Tr. 97), Bruce requested an administrative
hearing.  Tr. 118.  A hearing was held before an Administrative Law Judge ("ALJ") on
September 12, 2018.  Tr. 28-57.  In his January 3, 2019, decision (Tr. 15-23), the ALJ
determined that there are jobs that exist in significant numbers in the national economy that

Bruce can perform, i.e., he is not disabled.  Bruce requested review of the ALJ's decision by the Appeals Council (Tr. 179) and, on January 10, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Bruce was born in 1965 and was 50 years old on the date he filed his application.  Tr. 21. He attended school until tenth grade and worked as a concrete finisher for 25-30 years.  Tr. 37.

### B.  Relevant Medical Evidence

In June 2013, Bruce saw Dr. Zanotti, M.D., at University Hospital's Center for Orthopedics.  Tr. 408-409.  He complained of left hand and right knee pain which had been bothering him for "quite some time."  He reported doing concrete work and having a history of symmetrical arthritis for the last few years.  It had gotten worse, especially in the mornings, and took him 2-3 hours to resolve his stiffness.  He tried anti-inflammatory medicine and pain management without much improvement.  Dr. Zanotti reviewed x-rays, which showed some minimal degenerative changes through the hand and knee joint spaces that were fairly well maintained.  He was assessed with multiple joint arthritis, symmetrical, with morning stiffness, and, specifically, localized arthritis of the knee and trigger finger (acquired).  Dr. Zanotti recommended blood work, a rheumatology evaluation, and conservative treatment.

On December 29, 2014, Bruce saw Dr. Brabender, M.D., for a 6-month follow-up for his hypertension, hypercholesterolemia, and chronic back pain.  Tr. 325-326.  He had been laid off from his concrete job (working 7 days a week) and had not been hunting or doing anything at all. He reported that his back pain was stable and may improve a little bit over the next few weeks. He was taking his blood pressure and cholesterol medications and tolerating them well.  His

hands were giving him more pain and he was having more issues with them while working. Upon exam, he had a decreased range of motion, tenderness, deformity and pain in his thoracic and lumbar spine, and spasm in his thoracic spine. Dr. Brabender assessed his blood pressure as "doing well"; ordered blood work to assess his hypocholesteremia, which came back normal; and he was ordered to continue with his current medications (hydrocodone-acetaminophen) for his chronic back pain. His medications were regularly refilled. E.g., Tr. 322, 319.

In July 2015, Bruce followed up with Dr. Brabender. Tr. 298-301. He was back working pouring concrete and had worked 57 hours that week. His blood pressure was normal and he was tolerating his medications. He was still experiencing chronic lumbar pain. His medications were refilled that day and regularly thereafter. E.g., Tr. 315, 313.

In February 2016, Bruce followed up with Dr. Brabender for his lower back. Tr. 302-307. He also reported new left knee pain. His knee was swelling up at times and he was no longer able to work; he couldn't perform the stooping necessary due to his low back and he could not work with his hands. He was helping to take care of his grandchildren. His blood pressure was doing well. Upon exam of his left knee, he had a decreased range of motion, no swelling, and tenderness at the medial joint line and lateral joint line. He had a decreased range of motion in his lumbar spine, bony tenderness, pain and spasm. Dr. Brabender noted that his hypertension was doing well and ordered x-rays for his knee and an orthopedic referral. Chronic pain of left knee was added to his diagnoses. His medications were continued and refilled regularly thereafter. E.g., 363, 345. In June 2016, it was noted that he had not been seen since February and, therefore, he needed to establish care with a new primary care physician. Tr. 345. "Due to high number of Norco," it was recommended he visit pain management for review.

On January 14, 2017, Dr. Walker, M.D., took x-rays of Bruce's right knee, lumbar spine,

and right hand.  The right knee was normal except that "joint spacing is mildly decreased particularly on the median side."  The lumbar spine was normal except for mild facet arthropathy of L3.  The right hand was normal except for a small but notable fracture of the base of the distal phalanx of the thumb with possible extension into the joint line; this appeared "subacute vs. chronic as there appears to be some healing calcification."  Tr. 349.

In April 2017, Bruce returned to the Cleveland Clinic and saw primary care physician Dr. Ferenczy, M.D.  Tr. 354-358.  He complained of back and knee pain and reported being in a motor vehicle accident the previous month and reported a fractured hyoid bone.  He had not followed up with referrals (orthopedics, pain management) from the previous year.  His blood pressure was high but he had run out of his medication.  Upon exam, he had some osteoarthritis deformities in his hands, tenderness in his knees and low back, and pain on range of motion testing in his low back.  He had a normal gait, normal muscle tone and strength, intact reflexes, and normal range of motion in other areas of his back.  He was advised to restart his blood pressure medication and statin, prescribed non-opiate medications for his pain, and told to consider consulting pain management if those did not work.

A November 2017 MRI of Bruce's lumbar spine showed multilevel disc protrusions with foraminal stenosis, most pronounced on the left at L3 and the right at L4, and multilevel anterior disc protrusion/bulge.  Tr. 382

On February 12, 2018, Bruce saw certified nurse practitioner Ms. Williams.  Tr. 390-391. He reported having been in a car accident in March 2017 and complained of aching/stiffness, intermittent pain (rated 8/10), and radiation and numbness/tingling down his left arm and left leg. He reported minimal improvement with taking Aleve.  Various daily living activities affected his pain.  Upon exam, he had 5/5 strength in his extremities other than his left upper extremity,

which was 4/5; intact sensation; and his gait was slow.  He had a mild loss of cervical curvature, spasm/tenderness, and limited range of motion; tenderness and spasm in his thoracic spine; mild loss of normal lordosis in his lumbar spine, with spasm/tenderness and decreased range of motion; and positive straight leg raise testing on the left.  He was advised to continue therapy, continue taking NSAIDs, and obtain a cervical MRI.

On February 14, 2018, Bruce saw Dr. Zanotti for hand pain.  Dr. Zanotti assessed left hand degenerative joint disease with 3rd metacarpophalangeal destruction.  Tr. 384.  He explained that Bruce had a significantly arthritic joint, they discussed several treatment options, and Bruce opted to try medications "to see if it helps with the fingers in terms of motion and strength."  He was prescribed Meloxicam and instructed to return in 6-8 weeks.  If his hand did not improve, they could consider an injection and a referral to the Hand Team for further treatment options, including knuckle replacement.

In March 2018, an MRI of Bruce's cervical spine indicated that the study was limited by moderately severe motion artifact on all sequences and showed multilevel cervical spondylitic changes and disc bulging, which, at worst, were mild to moderate.  Tr. 381.

In April 2018, Bruce visited the Cleveland Back and Pain Management Center for chronic neck and low back pain.  Tr. 371.  He reported back pain beginning 20 years prior and neck pain beginning one year ago.  Tr. 373.  His pain was shooting, burning, continuous and numb and rated 7-8/10 in the past month, currently 7/10.  Walking, standing and lifting increased his pain and medication and rest improved it; he had tried physical therapy in the past and it had provided minimal relief.  His 2017 and 2018 lumber and cervical MRIs were reviewed.  Upon exam, he had an antalgic gait; normal, 5/5 motor strength; and tenderness in his lumbar spine in various areas with decreased range of motion with pain.  He had decreased median and ulnar

nerve distribution on the right and positive seated straight leg raise testing on both legs.  Tr. 374.

He had bilateral cervical spine tenderness of the paracervicals, scalene, and trapezius muscles

and painful range of motion.  He was assessed with degenerative lumbar and cervical

intervertebral discs, cervical spondylitis, chronic low back pain, and long-term drug therapy.  He

was prescribed Norco, naproxen, and cyclobenzaprine.  Tr. 375.  He returned to pain

management in May, June, and July 2018 and also reported pain in both hands and knees.  E.g.,

Tr. 394.

### C. Opinion Evidence

#### 1. Consultative Examiner

On August 11, 2016, Bruce saw Dr. Darr for a consultative examination.  Tr. 333-336.

Bruce stated that he was involved in a car accident in 1988 and hurt his back and knees.  He had

to be on his knees as a concrete worker.  Over time, he developed more pain in his back and

knees and also in his hands, and he could no longer do concrete work.  He also had trouble

walking, and Dr. Darr observed that he walked with a steady, antalgic gait, was stable while

stationary, comfortable sitting and lying down, and could walk on his heels and toes, perform a

tandem gait, and squat without difficulty.  His hands had no tenderness, warmth, or swelling, and

he could make a fist bilaterally.  His grip strength was normal bilaterally.  His legs were not

tender, red, or swollen, and his joints were without crepitus.  He had no tenderness or spasm in

his cervical spine.  His lumbar spine was tender, but without spasm, and he had negative straight

leg raise testing.  His muscle strength was full, 5/5, throughout in all extremities, he had no

atrophy, and he had normal sensation and reflexes.  Upon manual muscle testing, he had a

limited range of motion of his lumbar spine, normal range of motion in his cervical spine, and

normal findings in all other areas.  Dr. Darr's impression was pain in lower back, both knees and

both hands, "probably from degenerative arthritis because of his concrete work, kneeling on his hands and knees and bending the back most of the time while working." He remarked that Bruce's upper extremity functions for reaching, handling, fine and gross movements were intact, he walked with an antalgic gait, he can push and pull objects with difficulty, he would have difficulty manipulating objects and operating hand and foot controls, he can drive a motor vehicle and travel without any difficulty, and he has trouble climbing stairs. Dr. Darr opined that Bruce could lift and carry between 10 and 15 pounds frequently and over 15 pounds occasionally and he had no problems doing daily activities.

### 2. State Agency Reviewing Physicians

In August 2016, state agency reviewing physician Dr. McKee, M.D., reviewed Bruce's record. Regarding his RFC, Dr. McKee opined that Bruce could lift/carry 20 pounds frequently and 10 pounds occasionally; sit, stand/walk six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (but never ladders, ropes or scaffolds); and frequently engage in handling and fingering activities. Tr. 78-80. In January 2017, state agency reviewing physician Dr. Prosperi, D.O., adopted Dr. McKee's opinion, except that she found that Bruce had no handling or fingering restrictions and could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Tr. 92-94.

### D.  Testimonial Evidence

### 1. Bruce's Testimony

Bruce was represented by counsel and testified at the administrative hearing. He testified that he can no longer perform his past job as a concrete worker because he is unable to bend over or run heavy equipment. Tr. 39. He can't pick up a shovel or tie his shoelaces. Tr. 39. He can't bend over due to bad discs in his back; he also has some in his neck. Tr. 41-42. He is unable to

fully close his hands into a fist.  Tr. 42.  The orthopedic hand center told him they could give him

cortisone injections, which didn't work the last time he had it done, or knuckle replacements,

which are expensive and only last 7 years.  He is on pain medication for his hands, but it only

eases the pain, it does not stop it.  Tr. 43.  He drops things "all the time" because he has

problems grasping.  Tr. 44.  He has only been to the hand center twice; the first time, over ten

years ago, they told him to see a rheumatologist, who told him he did not have arthritis.  Tr. 44.

Bruce stated that he also has bad knees from bending and squatting so often while

working, hundreds of times a day.  Tr. 45-46.  His doctor told him he has osteoarthritis in his

knees.  Tr. 46.  They "go out" on him and he falls down.  Tr. 46.  He has problems walking

distances; he can walk for a little bit (50-60 yards) but then he has to sit down.  Tr. 46.  When

asked how much he could lift with both his hands, Bruce answered 5-6 pounds, due to severe

hand pain.  Tr. 46.

During a usual day, Bruce "sit[s] around" and keeps an eye on his grandkids, aged 5 and

7.  Tr. 47.  He spends a lot of time lying in bed, which is upstairs.  Once he's up there he usually

doesn't come back down the stairs for awhile because its too much work.  Tr. 47.  He has a

driver's license but doesn't drive a whole lot.  He drives his wife to and from work and

sometimes picks the grandkids up from school.  Tr. 48.  His medications do not give him side

effects and he is on hydrocodone, an anti-inflammatory, Flexeril, and blood pressure and

cholesterol pills.  Tr. 48-49.

### 3.  Vocational Expert's Testimony

 A Vocational Expert ("VE") testified at the hearing.  Tr. 49-56.  The ALJ discussed with

the VE Bruce's past relevant work as a heavy equipment operator, pipe layer, and concrete

finisher.  Tr. 50-51.  The ALJ asked the VE to determine whether an individual with Bruce's

vocational history could perform his past work or any other work if he had the limitations subsequently assessed in the ALJ's RFC determination, described below. Tr. 51-52. The VE answered that such an individual could not perform Bruce's past work but could perform the following jobs with significant numbers in the national economy: marker, cleaner, and produce weigher. Tr. 52.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his January 3, 2019, decision, the ALJ made the following findings:

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.  Tr. 17.

2.      The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2015 through his date last insured of December 31, 2017.  Tr. 17.

3.      Through the date last insured, the claimant had the following severe impairments: arthritis; and mild neural foraminal narrowing.  Tr. 18.

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 18.

5.      Through the date last insured, the claimant has the residual functional

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

capacity to perform light work as defined in 20 CFR 404.1567(b) except
the claimant can occasionally use ramps and stairs but can never use
ladders, ropes or scaffolds.  The Claimant can occasionally balance,
stoop, and crouch.  Never kneel or crawl.  Frequent handling and
fingering bilaterally.  Tr. 18.

6.    Through the date last insured, the claimant was unable to perform any
past relevant work.  Tr. 21.

7.    The claimant was born in 1965 and was 52 years old, which is defined as
a younger individual age 18-49, on the date last insured.  The claimant
subsequently changed age category to closely approaching advanced age.
Tr. 21.

8.    The claimant has a limited education and is able to communicate in
English.  Tr. 21.

9.    Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework
supports a finding that the claimant is "not disabled," whether or not the
claimant has transferrable job skills.  Tr. 21.

10.   Through the date last insured, considering the claimant's age, education,
work experience, and residual functional capacity, there were jobs that
existed in significant numbers in the national economy that the claimant
could have performed.  Tr. 21-22.

11.   The claimant was not under a disability, as defined in the Social Security
Act, at any time from August 1, 2015, the alleged onset date, through
December 31, 2017, the date last insured.  Tr. 22.

### V. Plaintiff's Arguments

Bruce argues that substantial evidence does not support the ALJ's RFC determination or

his decision at step two.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at step two

Bruce argues that the ALJ erred at step two because he did not find the following, diagnosed impairments to be severe: chronic back pain, essential hypertension, hypercholesterolemia, chronic pain and arthritis of both knees, trigger finger, bilateral hand pain and arthritis, respiratory abnormalities, and cervicalgia. Doc. 11, pp. 15-17.

Step two is a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018) ("So whether the ALJ characterized Hedges' mental-health impairments as severe or non-severe at step two is 'legally irrelevant' and does not amount to error.").

Regarding Bruce's hypertension, the ALJ explained that it was not a severe impairment because evidence showed it was managed by medication and aggressive treatment was not recommended or anticipated.  Tr. 18, 19.  That was not error.  While the ALJ did not mention Bruce's hypercholesterolemia at step two, this was also not error.  A mere diagnosis of an impairment is not enough.  *Higgs*, 880 F.2d at 863 (finding no error for the Commissioner's failure to find an impairment severe at step two: "The mere diagnosis of [an impairment], of course, says nothing about the severity of the condition.").  Moreover, Bruce does not identify any medical evidence (or statements he made) describing how this impairment effects his ability to perform work.  So, too, with respect to his "respiratory abnormalities."[2]  The ALJ did not err when he did not find Bruce's hypertension, hypercholesterolemia, or respiratory abnormalities to be severe impairments.

That leaves Bruce's chronic pain and arthritis of both knees, trigger finger, bilateral hand pain and arthritis, and cervicalgia.  But at step two, the ALJ found that Bruce had the following severe impairments: arthritis and neural foraminal narrowing.  Tr. 18.  "Arthritis" covers Bruce's arthritis and pain in his knees and hands, as the ALJ thoroughly discussed subsequently in his decision.  Tr. 19 (describing Bruce's testimony regarding the arthritis and pain in his knees and hands; his diagnosis of multiple joint arthritis and morning stiffness; exam findings showing decreased range of motion and tenderness in left knee); Tr. 20 (discussing x-ray results of Bruce's knee and hand; and an exam in 2017 showing osteoarthritis in knee).  "Neural foraminal narrowing" covers Bruce's cervicalgia.  See also Tr. 20 (ALJ discussing MRI results of Bruce's cervical spine showing multilevel spondylitic changes and disc bulge and decreased ulnar nerve distribution).

---

[2] Bruce is a long-time cigarette smoker.  E.g. Tr. 355.  In his brief, he cites one treatment note from 2017 in which he complained of a frequent cough and was diagnosed with "cough" and "dyspnea and respiratory abnormalities."  Doc. 11, p. 6 (citing Tr. 356-357).

Finally, while the ALJ did not specifically mention "trigger finger," he considered Bruce's hand impairments, including his testimony regarding his inability to make a fist.  Tr. 19. He credited Bruce's testimony and cited diagnostic imaging regarding Bruce's hands when he included a further RFC limitation to frequent handling and fingering.  In sum, because the ALJ considered all Bruce's impairments in his decision, any failure to find an impairment severe at step two is not reversible error.  *See Fiske v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) ("[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two [does] not constitute reversible error." (internal quotation marks and citation omitted)).

### B. The remaining portions of the ALJ's decision are not erroneous

Bruce argues that the ALJ erred when he "rejected Dr. Darr's manipulative limitations"; substituted his judgment for trained professionals; and because his RFC assessment precludes meaningful review.  Doc. 11, p. 18.  The undersigned disagrees.

Bruce argues that the ALJ's decision discussing Dr. Darr's opinion fails to "address the key issue of whether Plaintiff is limited to 'frequent' rather than 'occasional' fingering, handling, and feeling or pushing and pulling."  Doc. 11, p. 19.  But Dr. Darr did not find Bruce to have any specific manipulative limitations.  Rather, Dr. Darr opined that Bruce's "upper extremity functions for reaching, handling, fine and gross movements are intact."  Tr. 336.  While Dr. Darr also opined that Bruce would have "difficulty manipulating objects," he did not state to what extent Bruce would be limited.  The ALJ limited Bruce to frequent handling and fingering, which is consistent with what the first state agency reviewer opined (Tr. 80).[3]  In other words, the ALJ adopted the only opinion in the record that contained specific handling and fingering limitations: limiting Bruce to frequent handling and fingering.  Thus, the ALJ did not err when

---

[3]  The second state agency reviewer opined that Bruce had no limitations in handling and fingering.

14

discussing Dr. Darr's opinion.

Next, Bruce argues that the ALJ substituted his personal interpretation of Bruce's MRIs when he stated that the MRIs showed "mild neural foraminal narrowing[] over the opinions of Plaintiff's acceptable medical sources: Drs. Brabender and Ferenc[z]y, Zanotti, Ms. Germany and Ms. Williams." Doc. 11, p. 19 (internal quotations omitted). This is in reference to the ALJ's assertion at step two that Bruce had two severe impairments: arthritis and mild neural foraminal narrowing. Tr. 18. First, the names Bruce lists did not provide opinions in this case. Thus, there were no relevant opinions for the ALJ to supplant. Next, regardless of what the ALJ called this impairment at step two, he accurately detailed the x-ray and MRI results later in his opinion. Tr. 20. Bruce does not dispute that the imaging showed, at worst, some areas of mild to moderate foraminal narrowing in his cervical spine. And diagnostic tests, alone, do not establish RFC limitations. The ALJ did not err when he referred to Bruce's neural foraminal narrowing at step two as mild.

Finally, Bruce contends that the ALJ's RFC finding precludes meaningful judicial review. Doc. 11, p. 20. The arguments he advances are repackaged versions of his objections discussed above. Id. (complaining about the ALJ's step two finding and his failure to explain why he limited Bruce to frequent rather than occasional handling and fingering). Those arguments are without merit. Bruce has not identified an error made by the ALJ in this case. Substantial evidence supports the ALJ's decision, and it must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 29, 2020

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).